FILED
2024 Aug-14  PM 01:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | | |
|---|---|---|
| CONSTANCE D. MCELRATH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:22-cv-207-GMB |
| | ) | |
| WALKER COUNTY BOARD OF EDUCATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Constance McElrath filed an amended complaint against her employer, the Walker County Board of Education (the "Board"), alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(m), and 42 U.S.C. § 1981, along with violations of the Equal Pay Act, 29 U.S.C. § 206(d), and the Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. § 2000e-5(e)(3). Doc. 9 at 13–33. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 22. Before the court is the Board's Motion for Summary Judgment. Doc. 33. The motion is fully briefed (Docs. 34, 35, 44, 45 & 47) and due to be granted.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477

U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). On the other hand, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II.  FACTUAL BACKGROUND

The Board hired McElrath, a black woman, as a paraprofessional[1] in the

---

[1] The record uses the terms "paraprofessional," "auxiliary teacher," and "instructional aide" interchangeably. All describe similar positions, none of which require a teaching certificate. Doc. 35-8 at 9; Doc. 45 at 23; Doc. 9 at 6–19, 23.

special education department at Carbon Hill Elementary School in 2013. Doc. 35-8 at 9.  McElrath remained in that position until 2015, when she transferred to Carbon Hill High School as an aide in the special education department. Doc. 35-8 at 9.  She worked in the Valley School District as an aide from 2016 to 2022. Doc. 35-8 at 9.  As of January 2024, McElrath remained employed as a paraprofessional in the special education department at Valley Junior High School. Doc. 35-2 at 8.

While working for the Board, McElrath enrolled in an online undergraduate program at Grand Canyon University in Arizona. Doc. 35-2 at 12, 151–52.  She graduated with a Bachelor of Science in elementary education and special education in January 2021. Doc. 35-8 at 1.  After graduation, McElrath could have obtained a teaching certification in Arizona and then applied for reciprocity in Alabama. Doc. 35-2 at 150–51.  But McElrath decided to seek her teaching certification only in Alabama. Doc. 35-2 at 151.  She took the Alabama Praxis Exam twice but did not pass. Doc. 35-2 at 24–29.  As of May 17, 2023, McElrath was not scheduled for another attempt to take the Praxis Exam. Doc. 35-2 at 25.

The Praxis Exam and reciprocity were not necessarily the only ways for McElrath to obtain an Alabama teaching certificate. Doc. 35-1 at 67; Doc. 35-2 at 150–53.  A temporary, alternative option existed—even without passing the exam, McElrath could become a certified teacher with an Emergency Teaching Certificate. Doc. 35-1 at 67.  With this alternative route, the school would review McElrath's

credentials and decide whether she met the requirements for an Emergency Teaching Certificate set by the Alabama State Department of Education ("ALSDE").[2] Doc. 35-1 at 67.  If so, the school could hire McElrath as a teacher and then apply to the ALSDE for an Emergency Teaching Certificate on her behalf. Doc. 35-1 at 67. If approved, the Emergency Teaching Certificate would be valid for a two-year period. Doc. 35-1 at 67.

From February 2021 through May 2022, McElrath applied for many employment positions throughout the Walker County school system but was awarded only one temporary position.  On May 13, 2021, McElrath received an email informing her that the Board approved her application for employment as a K-3 Summer Literacy Camp Aide at Valley Junior High School. Doc. 35-1 at 9–22; Doc. 35-4 at 1.  McElrath applied for other positions—some requiring a teaching certificate and others not—while, according to McElrath, the Board filled other positions without posting them. Doc. 35-2 at 139–40, 150–53; *see also* Doc. 35-3. McElrath believes that the Board discriminated against her as a black woman because she was not awarded any of the available positions. Doc. 35-2 at 69–70.

The court groups the positions below for ease of analysis.[3]   McElrath

---

[2] There is no evidence in the record defining these requirements.

[3] The record is anything but clear about many of the positions and some of the evidence is entirely contradictory.  The court has done its best to sift through the evidence on each position and notes any contradictions in the record where appropriate.  And, of course, the court has interpreted the evidence in the light most favorable to McElrath at this summary judgment stage.

complains about the Board's failure to hire her into 18 educational positions that involved directly teaching or supervising students, plus eight administrative positions such as jobs as a network technician, bookkeeper, or library aide. *See* Doc. 9 at 9–22; *see also* Doc. 35-3 at 2–9.   The court first discusses the 15 educational positions[4] that required a teaching certificate, and then the three that did not, followed by the eight administrative positions.

## A.   The Educational Positions—Teaching Certificate Required

All of the positions discussed below required a teaching certificate. *See* Doc. 35-3 at 2–7.   It is undisputed that McElrath did not have a teaching certificate when she applied for these positions. *See* Doc. 35-2 at 24, 150–51; *see also* Doc. 45 at 14.

### 1.   *Sumiton Elementary School, K-3 Summer Literacy Camp Teacher*

The K-3 Summer Literacy Camp positions were temporary summertime teaching positions. Doc. 35-3 at 2.   More than one position was available, and McElrath submitted an application in February 2021 and another in April. Doc. 35-2 at 70.   The Board did not hire McElrath to fill any of the open positions. Doc. 35-1 at 16; Doc. 35-2 at 70, 87–88.

On May 27, 2021, the Board sent McElrath a single rejection notice stating, "[t]hank you for your interest in K-3 Certified Teacher Summer Camp Literacy . . .

---

[4] McElrath submitted two applications for some of the positions since there were multiple available slots for the same job.   The court discusses these duplicative applications together, resulting in a listing of 11 positions, even though McElrath applied for a total of 15 slots that required a teaching certificate. *See* Doc. 45 at 15–25.

at Sumiton Elementary.  We regret to inform you that another applicant was offered the position." Doc. 35-1 at 16.[5]  The Board hired five white women as K-3 summer literacy camp teachers (Rebecca Odom, Brooke Lloyd, Barbara Rollo, Leslie Earnest, and Shanalyn Jones) with varying qualifications. *See* Doc. 9 at 16; Doc. 34 at 15–16; Doc. 35-3 at 2–3; Doc. 35-5 at 1; Doc. 45 at 17–18.

More specifically, the Board first hired Odom on December 10, 2020, as an interventionist, and the ALSDE received her recommendation for a teaching certification on January 27, 2021. Doc. 35-5 at 1.  The ALSDE issued Odom's teaching certificate on March 2, 2021. Doc. 35-3 at 2–3; Doc. 35-5 at 1.  Lloyd held a valid teaching certificate in Virginia at the time the Board hired her for the literacy camp. Doc. 35-3 at 3; Doc. 35-5.  She was eligible for reciprocal certification in Alabama, for which she applied during the summer of 2021, then took the necessary Praxis certification exam and received her ALSDE teaching certificate on January 14, 2022. Doc. 35-3 at 3; Doc. 35-5.  Rollo had experience teaching Pre-Kindergarten ("Pre-K") through the state's Head Start program. Doc. 35-3 at 3; Doc. 35-5.  When the Head Start program ended, the ALSDE granted her a waiver to continue teaching at the Pre-K level. Doc. 35-3 at 3; Doc. 35-5.  Then, in August 2020, the Board hired Rollo as a Pre-K teacher. Doc. 35-3 at 3; Doc. 35-5.  Jones

---

[5] Notwithstanding this letter, McElrath and the Board both contend that the Board did not fill the position corresponding with her first application. Doc. 9 at 15; Doc. 45 at 15; Doc. 35-3 at 2–3.

received her teaching certificate in June 2020, and the Board hired her as a teacher in August 2020. Doc. 35-3 at 3; Doc. 35-5.  The Board hired Earnest as a Pre-K teacher in August 2020. Doc. 35-3 at 3; Doc. 35-5.  Earnest met the requirements for an Emergency Teaching Certificate, and the Board applied for one on her behalf in the fall of 2021. Doc. 35-5.

### 2. *Sumiton Middle School, Special Education Teacher*

McElrath applied for this position on or around May 18, 2021, but did not receive it. Doc. 35-2 at 94–95.  The Board hired Alyssa Kennedy, a white woman, as the Sumiton Middle School special education teacher. Doc. 35-2 at 95; *see also* Doc. 35-2 at 125.  Kennedy qualified for an interim teaching certificate at the time the Board hired her on August 5, 2021. Doc. 35-3 at 4–5.  The ALSDE received her application for an interim teaching certificate on October 15, 2021, and issued her certificate on January 24, 2022. Doc. 35-5.

### 3. *Sumiton Elementary School, K-6 Teacher*

McElrath applied for this position on September 2, 2021. Doc. 9 at 18; Doc. 35-1 at 14; Doc. 35-2 at 103.  The Board hired Abby Hart, a white woman, for the position. Doc. 35-2 at 103–04; Doc. 35-4 at 3–8.  Before her hiring, Hart's undergraduate institution, Athens State University, sent a letter to the Board stating that she was "on track to graduate on December 4, 2021, and [was] expected to be awarded a Bachelor's of Science degree in Education with a major in Elementary K-

6." Doc. 35-4 at 7.  The letter also confirmed that Hart's degree covered the ALSDE teacher education certification requirements and that the school would be forwarding Hart's application packet for certification to the ALSDE. Doc. 35-4 at 7.  The ALSDE received Hart's application on February 10, 2022, and issued her teaching certificate on March 15, 2022. Doc. 35-4 at 3–5.

### 4.      *Sumiton Elementary School, K-4 Teacher*

McElrath applied for this position on or around May 4, 2022. Doc. 35-1 at 20; Doc. 35-3 at 7.  The Board notified McElrath that the position had been awarded to another applicant. Doc. 35-1 at 20.  The record is silent as to who received the position.[6]

### 5.      *Valley Junior High School, K-3 Summer Literacy Camp Teacher*

McElrath applied for this position on or around April 12, 2021, but did not receive the job. Doc. 35-1 at 17; Doc. 35-2 at 89–90.  The parties argue in their briefs that the position was not filled (Doc. 34 at 16; Doc. 45 at 18), but the Board notified McElrath that it had awarded the position to another applicant. Doc. 35-1 at 17.  The record is silent as to who received the position if, in fact, the Board filled it.

---

[6] The Board submitted records that presumably identify the recipients of some of the posted positions. Doc. 35-4 at 8; Doc. 35-8 at 10–11.  The only reference in the parties' briefs to these documents is the representation that they are "an accurate copy of certain records maintained by the Board of Education relevant to Plaintiff's claims." Doc 35-3 at 9.  Neither party otherwise discusses these documents or explains their relevance.  And although the documents do not reflect the race, gender, or qualifications of every individual awarded a position, at summary judgment the court accepts McElrath's claim that the Board hired a white person for every position. Doc. 35-2 at 69–70, 124–25.

### 6.     *Valley Junior High School, Special Education Teacher*

McElrath applied for this position multiple times but did not receive any of the three openings. *See* Doc. 35-2 at 75–76.  The Principal of Valley Junior High School, Joe Harrison, "interviewed [McElrath] for over two and a half hours for th[is] job position." Doc. 35-2 at 76–77.  Ultimately, the Board hired Chase Trotter, a white man, for one of the open positions. Doc. 9 at 15; Doc. 35-1 at 9–10; Doc. 35-2 at 76.  Trotter held a valid teaching certificate issued by the Alabama State Department of Education. Doc. 35-3 at 2; Doc. 35-5 at 1.  The Board did not hire anyone for the other two positions.[7] Doc. 35-2 at 99; Doc. 35-3 at 5.

### 7.     *Valley Junior High School, K-6 Teacher*

McElrath submitted one application for this position on or around August 17, 2021, and another application on or around September 7, 2021, but the Board did not hire her for the positions. Doc. 35-1 at 11–15; Doc. 35-2 at 103.  McElrath received notifications that the Board had awarded the positions to other applicants on September 7, 2021; November 9, 2021; and December 9, 2021. Doc. 35-1 at 11–15.  The Board hired a white woman, Hannah Ingram, in one of the positions. Doc. 9 at 18; Doc. 35-2 at 104–05; Doc. 35-2 at 125.  Ingram was certified to teach Pre-K through third grade and her placement was within this grade range. Doc. 25-3 at

---

[7] The Board's records show that McElrath received two individual notifications that it hired another applicant in the Valley Junior High School Special Education Teacher positions. Doc. 35-1 at 9–10, 15, 19.  There is no indication who received these positions if, in fact, they were filled.

6.  The record is silent as to who received the other positions.

### 8.    *Dora High School, Special Education Teacher*

There were two open positions for a Special Education Teacher at Dora High School, and McElrath applied for both.  She submitted her first application on or around April 12, 2021, but the Board hired William Keaton, a white man. Doc. 35-1 at 18; Doc. 35-2 at 91–92; Doc. 35-2 at 125.  The Board had received a letter dated April 8, 2021, "from Athens State College confirming Mr. Keaton's date of graduation and that the college was submitting an application to the [ALSDE] for Keaton's teaching certificate." Doc. 35-3 at 3–4; Doc. 35-5.  The Board hired Keaton on May 14, 2021, and the ALSDE issued his teaching certificate on July 13, 2021. Doc. 35-5.

McElrath again applied for this position on or about May 27, 2021. Doc. 35-1 at 18; Doc. 35-2 at 96; Doc. 35-3 at 5.  The position remained open for an extended period because there were no applicants with a teaching certification. Doc. 35-3 at 5.  Eventually, the Board hired a white woman, Anna Kate Gilbert, "in August 2023 after the Board received a letter from the University of West Alabama confirming that she had completed all requirements for a bachelor's degree and UWA was submitting her application for a teaching certificate" to the ALSDE.[8] Doc. 35-3 at 5.

---

[8] The Board's records reflect that almost one year before, on June 2, 2022, McElrath received a notification that the position had been awarded to another applicant. Doc. 35-1 at 20.  Neither party discusses this rejection in briefing or identifies the recipient of the position.

### 9.        *Parrish Elementary School, K-3 Summer Literacy Camp Teacher*

The Summer Literacy Camp Teacher position was a temporary position. Doc. 35-2 at 85–86; Doc. 35-3 at 2.  McElrath applied for this position on or around April 12, 2021, but did not receive it. Doc. 35-1 at 15; Doc. 35-2 at 85; Doc. 35-3 at 2.  The Board hired three white women (Cathy East, Misty Martin, and Aime White) in the open slots. Doc. 35-2 at 85–87.  East, Martin, and White all held teaching certificates. Doc. 35-5 at 1.

### 10.       *Oakman High School, Special Education Teacher*

McElrath applied for this position on or around May 27, 2021, but did not receive it. Doc. 35-2 at 98.  There is no evidence in the record that this position was filled or, if so, who the Board hired. *See* Doc. 35-2 at 98; Doc. 35-1 at 1–30.

### 11.       *Cordova High School, Special Education Teacher*

McElrath applied for this position on or around November 3, 2021, but was not hired. Doc. 35-1 at 21; Doc. 35-2 at 109.  On May 12, 2022, the Board notified her that the position had been awarded to another applicant. Doc. 35-1 at 21.  The record is silent as to who received the position. *See* Doc. 35-2 at 109.

## B.    Educational Positions Not Requiring a Teaching Certificate

The three positions below did not require a teaching certificate. Doc. 35-3 at 4, 6.

### 1.      Parrish Elementary School, K-3 Summer Literacy Camp Aide

McElrath applied for this position on or around June 10, 2021, but did not receive it. Doc. 35-1 at 15; Doc. 35-2 at 101; Doc. 35-3 at 4.  Although she and the Board claim that the position was never filled (*see* Doc. 35-2 at 101; Doc. 35-3 at 4), the record contains a notification from the Board to McElrath that the position had been awarded to an unidentified applicant. Doc. 35-1 at 15.

### 2.      Sumiton Elementary School, K-3 Summer Literacy Camp Aide

McElrath applied for this position on or around April 12, 2021, but did not receive it. Doc. 35-3 at 4.  The record contains a notification from the Board to McElrath dated May 13, 2021, that the position had been awarded to another applicant. Doc. 35-1 at 16.  The Board may have hired either Kassie Salors or Sherrie Hawkins for this position.[9] Doc. 35-8 at 10.

### 3.      Valley Junior High School, Auxiliary Teacher

McElrath applied for this position on or around September 22, 2021. Doc. 35-1 at 14; Doc. 35-2 at 105.  There were several positions available and they did not require a teaching certificate. Doc. 35-2 at 105–06; Doc. 35-3 at 6.  The Board hired two white women, Julie Vines and Tabetha Akins, as auxiliary teachers at Valley

---

[9] The record contains a document titled "Public List of Walker County Board of Education Posted Support Summer Literacy Position(s)," dated May 13, 2021, that identifies "Kassie Salors" and "Sherrie Hawkins" as Sumiton Elementary K-3 Summer Camp aides. Doc. 35-8 at 10.  Neither party relies on this list in arguing about this position, and it does not reflect the race of either woman.

Junior High. Doc. 35-2 at 105–09.  Vines and Akins "were selected by the supervisor over Pre-K programs who recommended them to the superintendent." Doc. 35-3 at 6.

## C. The Non-Educational Positions

### 1. *Walker County Board of Education, Office Technical Support*

McElrath applied for this position on or around March 1, 2022. Doc. 35-2 at 115–16; Doc. 35-3 at 7.  The Board hired "another applicant with prior relevant experience whose qualifications were better matched to the requirements of the job." Doc. 35-3 at 7; *see also* Doc. 35-7.  The record does not disclose this person's identity, race, or gender.

### 2. *Walker County Board of Education, Network Technician Level 1*

McElrath applied for this position on or around May 4, 2022. Doc. 35-2 at 116.  McElrath testified that the Board hired a white man named Jimmy Robins instead of her.[10] Doc. 35-2 at 117.  The Board notified McElrath that the position had been awarded to another applicant on May 12, 2022. Doc. 35-1 at 21.  The Board did not hire McElrath because her "education and prior experience were not well-suited for th[e] position." Doc. 35-3 at 7; *see also* Doc. 35-6.

### 3. *Cordova Elementary School, Bookkeeper*

McElrath did not apply for this position and contends it was never posted.

---

[10] The Board has no record of an employee by that name. Doc. 35-3 at 7; Doc. 35-5 at 1.

Doc. 35-2 at 125, 139–41; Doc. 35-3 at 7–9.  The Board transferred Shawna Gilbert[11] into the position. Doc. 35-3 at 8; Doc. 35-2 at 125.  Gilbert had been working at the Board's central office and had previous bookkeeping experience. Doc. 35-3 at 8.

### 4.    *Parrish Elementary School, Bookkeeper*

McElrath did not apply for this position and contends it was never posted. Doc. 35-2 at 125, 139–41; Doc. 35-3 at 7–9.  Sharon Riddle,[12] who served as a receptionist at Parrish Elementary School, applied for the bookkeeper position and the principal selected her based on her interview performance and the results of a test given to the applicants. Doc. 35-3 at 8.  The Superintendent recommended Riddle, and the Board approved her transfer. Doc. 35-3 at 8.

### 5.    *Central Office, Payroll Position*

McElrath did not apply for this position and contends it was never posted. Doc. 35-2 at 125, 139–41; Doc. 35-3 at 7–9.  The Board hired Amy Vick[13] into the payroll position because she had prior relevant experience as a bookkeeper at Parrish Elementary School. Doc. 35-3 at 8.

---

[11] The record does not clearly reflect Gilbert's race, but viewing the facts most favorably to McElrath, the court will assume she is white since McElrath testified that the Board awarded every relevant position to a white person.

[12] The record does not clearly reflect Riddle's race, but viewing the facts most favorably to McElrath, the court will assume she is white since McElrath testified that the Board awarded every relevant position to a white person.

[13] The record does not clearly reflect Vick's race, but viewing the facts most favorably to McElrath, the court will assume she is white since McElrath testified that the Board awarded every relevant position to a white person.

### 6.   Central Office, Purchase Order Position

McElrath did not apply for this position and contends it was never posted. Doc. 35-2 at 125, 139–41; Doc. 35-3 at 7–9.  The Board hired Rhonda Posey[14] for the position because she had prior relevant experience as a bookkeeper at Oakman Middle School. Doc. 35-3 at 9.

### 7.   Valley Junior High School, Library Aide

McElrath approached Harrison and the administrative assistant to the superintendent of schools, Steven Rowe, about a library aide position that would soon be available because the current library aide planned to retire. Doc. 35-2 at 32, 35.  Although McElrath expressed her interest in the position, she did not apply for the opening and contends it was never posted. Doc. 35-2 at 32–41.  The Board hired Brandi Gunter, a white woman, as the Valley Junior High School library aide. Doc. 35-2 at 32, 34–35, 110–11; Doc. 35-3 at 7.

### 8.   Central Office, Insurance Position

This position was not posted. Doc. 35-3 at 8.  Instead of hiring someone to fill the insurance position, the Board reassigned these duties to a payroll specialist in the Board's central office. Doc. 35-3 at 8.

---

[14] The record does not clearly reflect Posey's race, but viewing the facts most favorably to McElrath, the court will assume she is white since McElrath testified that the Board awarded every relevant position to a white person.

**D.     Complaints and Internal Investigations**

In the fall of 2021, McElrath started discussions with Michelle Howell, the Board's Special Education Supervisor, about her treatment in the workplace and her inability to secure these positions.[15] Doc. 9 at 5; Doc. 35-2 at 54–55; *see also* Doc. 35-1 at 42, 46.   McElrath told Howell that the principal of Valley Junior High School, Joe Harrison, and her other colleagues were harassing her. Doc. 35-2 at 39– 43, 50, 54.   She reported a number of specific incidents, including when (1) she was pulled out of the classroom for questioning, (2) other employees opened her personal mail,[16] and (3) someone changed the door codes to deny her access to certain parts of the school, including the break stand. Doc. 35-2 at 43–44, 136.   When questioned about these incidents during her deposition, McElrath admitted that "[n]obody has made any race-based [or gender-based] comments to [her] in [her] face." Doc. 35-2 at 54.   She nevertheless maintained that these things occurred "because of [her] race and [her] gender." Doc. 35-2 at 50.

**E.     McElrath's Discipline**

In early October, McElrath sent an email to Howell and Rowe: "[S]ince the hostile work environment matter has yet to be resolved and has continue[d] to

---

[15] In May 2021, Howell contacted McElrath because she "saw that [McElrath] applied for a couple of jobs and wanted to get an update" from her. Doc. 35-1 at 46.
[16] Later that fall, emails between McElrath and Rowe indicate that Rowe investigated whether anyone had opened McElrath's personal mail, but he could not prove anything of the sort had happened. Doc. 35-1 at 48.   Rowe closed this investigation on October 25, 2021. Doc. 35-1 at 48.

escalate, I think it is best . . . that I cancel or limit my communication with Mr. Harrison since he is the direct cause for the harassment towards me." Doc. 35-1 at 41. McElrath also emailed Howell and Rowe on October 4 and 6, 2021, to report incidents of Harrison's "harassment and discrimination" of her. Doc. 35-1 at 40–41. These incidents included, but were not limited to, the claim that other employees inquired about her job duties and performance "on the direction of Mr. Harrison," Harrison's requirement that she "put down [her] time to the exact minute," and more general complaints that Harrison was "intentionally creating an environment of hostility, stress, and dissension." Doc. 35-1 at 40, 41. McElrath did not mention whether she believed this treatment related to her race or gender.

On October 19, 2021, McElrath emailed Rowe to report another incident of workplace harassment involving Harrison. Doc. 35-1 at 51. McElrath reported that earlier in the day some of the other paraprofessionals, under instructions from Harrison, denied her and another individual access to the break stand. Doc. 35-1 at 51. At the end of the workday, McElrath questioned Harrison about the incident, and he "acted as if he had no idea of what [she] was talking about" but promised he would investigate the situation. Doc. 35-1 at 51. McElrath requested that Rowe send her a copy of the standard Harassment Complaint Form for the Walker County school system, which he did the next day. Doc. 35-1 at 51–52.

Three days later, Harrison sent McElrath a formal disciplinary write-up to be

placed in her personnel file. Doc. 35-8 at 54.  The letter described an incident on October 19, 2021, when McElrath refused Harrison's direction to return to her duties. Doc. 35-8 at 54.  According to the write-up, McElrath "[was] told multiple times to return to [her] duties/assignment and given multiple opportunities to comply[,]" but "continued to be insubordinate." Doc. 35-8 at 54.  Harrison ended the write-up by stating that "[a]ny subsequent acts of insubordination may result in suspension without pay." Doc. 35-8 at 54.  The handwritten note "refused to sign— said she was not signing anything" appears above McElrath's signature line. Doc. 35-8 at 54.

On October 25, 2021, McElrath formally documented her grievances by submitting a Harassment Complaint form. Doc. 35-1 at 35.  She claimed "harassment" and "abuse of authority" by Harrison. Doc. 35-1 at 34.  Around the blank for the date of the complaint, McElrath handwrote 15 dates spanning from September 20 through October 25, 2021. Doc. 35-1 at 34.  When prompted to provide specific details, McElrath wrote "I have filed a case of discrimination and harassment against principal Joe Harrison at Valley Jr. High School.  The write-up that was created on 10-25-21 is a result of direct retaliation of the charges I filed against him." Doc. 35-1 at 34.  McElrath signed and dated the form on October 25, 2021. Doc. 35-1 at 35.

## F.      EEOC Charge

On   October   27,   2021,   McElrath   filed   a   charge   of   race   and   gender[17] discrimination as well as retaliation for engaging in protected activity with the U.S. Equal Employment Opportunity Commission ("EEOC"). Doc. 35-1 at 57–58.  She received her Dismissal and Notice of Right to Sue letter on or around November 22, 2021. Doc. 11-1 at 1.  McElrath filed this lawsuit on February 17, 2022. *See* Doc. 1.

### III.  DISCUSSION

At the outset, McElrath concedes that summary judgment is due to be granted to the Board on her Equal Pay claim under the Lilly Ledbetter Fair Pay Act. Doc. 45 at 28.  McElrath therefore maintains three types of claims against the Board: (1) race discrimination  in  violation  of  Title  VII  and  §  1981;  (2)  gender  discrimination  in violation of Title VII; and (3) retaliation in violation of Title VII and § 1981.  The Board moves for summary judgment on all of these claims.

## A.      Race and Gender Discrimination

Title VII prohibits an employer from discriminating against any employee with  respect  to  compensation,  terms,  conditions,  or  privileges  of  employment "because of" race or gender. 42 U.S.C. § 2000e-2(a)(1).  Section 1981 prohibits "intentional race discrimination in the making and enforcement of public and private

---

[17] McElrath's EEOC charge does not check the box on the form for "sex" discrimination. Doc. 35-1 at 57.  However, it is clear from the factual allegations within the charge that she complains about discrimination on the basis of her gender. Doc. 35-1 at 57–59 ("I believe I have been discriminated against because of my race, Black, sex, female, . . . .").

contracts, including employment contracts." *Ferrill v. Parker Gp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999); 42 U.S.C. § 1981.  The elements of race discrimination claims under Title VII and § 1981 are the same and need not be analyzed separately. *See Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000).

Absent direct evidence of discrimination, a plaintiff may prove her case through circumstantial evidence using the framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).  The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Id*.  After the *prima facie* case, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Id*.  As long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production at this stage. *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).

After an employer articulates one or more legitimate, non-discriminatory reasons for the employment action, the plaintiff must show that the proffered reason was a pretext for illegal discrimination. *Id*.  If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  To satisfy this burden and show pretext, the plaintiff may "demonstrate

'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  Although the burden of production may shift, the ultimate burden of persuasion remains with the plaintiff.  *E.E.O.C. v. Joe's Stone Crabs, Inc*., 296 F.3d 1265, 1272 (11th Cir. 2002).

The *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  This is because a plaintiff "will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*.  A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker. *Id*.; *see generally Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

### 1.   **McDonnell Douglas** *Framework*

McElrath contends that she suffered race and gender discrimination when she was not selected for a number of employment positions.  The court analyzes these cases under the Eleventh Circuit's failure-to-hire or failure-to-promote line of cases.

In this context, McElrath must meet four elements to make out a *prima facie* case: (1) she is a member of a protected class; (2) she applied for, and was qualified to fill, a position for which the employer was accepting applications; (3) she did not receive the position despite her qualifications; and (4) after her rejection, the employer either kept the position open or filled it with a person outside of her protected class.[18] *See Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005); *Joe's Stone Crabs, Inc.*, 296 F.3d at 1273; *Taylor v. Runyon*, 175 F.3d 861 (11th Cir. 1999). A plaintiff does not need to introduce evidence of the relative qualifications of the promoted person to satisfy her *prima facie* burden. *Walker v. Mortham*, 158 F.3d

---

[18] The parties devote a large portion of their briefing on the *prima facie* case to the question of whether the Board treated similarly situated employees outside of McElrath's protected class more favorably, relying on *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1224 (11th Cir. 2019), and similar authority. *Lewis* surely holds that "a meaningful comparator analysis must remain part of the *prima facie* case." *Id*. at 1224. However, even *Cobb v. Floyd*, 2022 WL 856074, at *1 (11th Cir. Mar. 23, 2022)—the parties' authority in favor of retaining the comparator analysis in the *prima facie* case—acknowledges an "alternative" to the similarly situated prong in the form of a "showing [that] she 'was replaced by a person outside [her] protected class.'" *Id.* (citing *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1286 (11th Cir. 2003)). Neither party mentions this alternative in their briefing to the court. However, the court acknowledges some confusion as to the correct formulation of the *prima facie* case in failure-to-promote and failure-to-hire cases. This being said, *Lewis* involved a termination and not a failure to promote or hire. The traditional *prima facie* case formulation in termination (and other discipline cases) depends on the similarly situated analysis clarified in *Lewis*. That is not the case in failure-to-promote and failure-to-hire cases. *See Vessels*, 408 F.3d at 768; *Joe's Stone Crabs, Inc.*, 296 F.3d at 1273; *Taylor*, 175 F.3d 861 (11th Cir. 1999). Those cases do not require analysis of whether the person hired or promoted were treated differently than similarly situated employees in the *prima facie* case. And, since *Lewis*, at least one published and multiple unpublished opinions of the Eleventh Circuit have not required a plaintiff to establish that the defendant treated a similarly situated person outside the plaintiff's protected class more favorably. *See, e.g.*, *Anthony v. Georgia*, 69 F.4th 796, 807 (11th Cir. 2023); *Tolley v. Mercer Univ.*, 2023 WL 8253812, at *3 (11th Cir. Nov. 29, 2023); *Shine v. Univ. of Ala.-Birmingham*, 2023 WL 1099766, at *2 (11th Cir. Jan. 30, 2023); *Shannon v. Nat'l R.R. Passenger Corp.*, 774 F. App'x 529, 540 (11th Cir. 2019). Instead, in those cases, the Eleventh Circuit used the "traditional" formulation of the *prima facie* case. *Tolley*, 2023 WL 8253812, at *3. This court does the same.

1177, 1193 (11th Cir. 1998).  Understanding the shifting burdens at the summary judgment phase, the court will begin its analysis with the educational positions that required a teaching certificate, continue with the educational positions that did not require a teaching certificate, and end with the non-educational positions.

### a.      The Educational Positions—Teaching Certificate Required

The Board argues that McElrath was not qualified for teaching jobs because she did not have a teaching certificate. Doc. 34 at 7–8, 11, 16, 18–19, 23.  The court agrees.  McElrath has admitted on multiple occasions that she does not have a teaching certificate. Doc. 35-1 at 56; Doc. 35-2 at 24, 116, 150–53.  She also admits she was not qualified to hold a teaching position without a certificate. Doc. 35-1 at 56; Doc. 35-2 at 116.  In fact, McElrath replied "undisputed" to the following statements in the Board's motion for summary judgment: "sixteen of those positions required a teaching certificate which McElrath did not have," "[s]he therefore was not qualified for the positions," and "McElrath admitted she was not qualified to hold the teaching positions that she applied for." *See* Docs. 34 at 7 & 45 at 7.

McElrath counters with the argument that the Board could have applied for an Emergency Teaching Certificate on her behalf. *See* Doc. 45 at 8, 15, 17, 19, 22, 25. The problem for McElrath, however, is that she has not produced any evidence that she was eligible to apply for an Emergency Teaching Certificate or that she asked the Board to apply for one or attempted it herself.  And on an even more fundamental

level, there is not any evidence in the record even reflecting the requirements for an Emergency Teaching Certificate in Alabama.

McElrath argues in her brief that "she was eligible for an emergency teaching certificate and . . . she submitted the proper documents as evidence; however, she was never given that opportunity." Doc. 45 at 8.  In support, however, McElrath relies on Defendant's Exhibit 4 at pages 64–66. *See* Doc. 45 at 8.  This citation cannot support her argument since Exhibit 4 is only 13 pages in length. *See* Doc. 35-4 at 1–13.  While it is not the court's job to weed through summary judgment submissions in search of evidence to support a party's position, *see, e.g.*, *Byrne v. Alabama Alcoholic Beverage Control Board*, 635 F. Supp. 2d 1281, 1297 n.16 (M.D. Ala. 2009),[19] McElrath may have intended instead to rely on an email forwarded to her in September 2021. *See* Doc. 35-1 at 67.  In responding to a question from another person about an emergency certificate, Cherrie Lockhart, who presumably works for the Walker County school system, explained in the email that some hires could be made "based on the fact that you meet the requirements for an Emergency

---

[19] "While the court reserves the right to consider evidentiary materials that are not specifically referenced in the brief, no party has a right to assume that the court will consider such materials. A specific reference must include the exhibit number, page, and line number when appropriate." Initial Order § D (Doc. 24 at 6)); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment"); *Pinto v. Univ. de Puerto Rico*, 895 F.2d 18, 19 (1st Cir. 1990) (noting that "the court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her").

Certificate" and provided a link to a website "to give you a better understanding of the certificate and to see what the requirements are." Doc. 35-1 at 67.  This email, which was not directed to McElrath, did not describe the requirements for an emergency certificate or offer any opinion on whether the recipient met the requirements—much less offer an opinion on McElrath's eligibility.  It thus does not support McElrath's claim, and arguments in briefs are not evidence. *E.g.*, *St. Farm Fire & Cas. Co. v. Lacks*, 840 F. Supp. 1292, 1297 (M.D. Ala. 2012) (citing *Vega v. Invesco Gp., Ltd.*, 432 F. App'x 867, 872 (11th Cir. 2011)).  With no other support in the record, no reasonable jury could conclude that McElrath was eligible for an emergency certificate.

Nevertheless, McElrath repeatedly argues that the Board hired both white people and men without teaching certificates or allowed them to obtain their teaching certifications while working as teachers. Doc. 45 at 15–22; *see also* Doc. 35-2 at 69–70, 88.  The implication, of course, is that they could have done the same for her. Doc. 45 at 8, 17–20.  But McElrath does not produce any evidence supporting these allegations, such as the identities of these people, their qualifications for an emergency teaching certificate, or the circumstances under which the Board hired them.  Such conclusory allegations cannot carry the day for McElrath when she has not introduced any competent evidence of her own eligibility for an emergency certificate.

In sum, the evidence establishes that McElrath applied for a number of teaching positions she was not qualified to hold because she did not have a teaching certificate.  The Board nevertheless might have hired her into these positions with a simultaneous application for an emergency certificate, but McElrath has not demonstrated she met the requirements for emergency certification. Doc. 35-1 at 56; Doc. 35-2 at 116, 150–53; Doc. 45 at 14.  For this reason, McElrath has not established that she was qualified for the various certified teaching positions she sought.  Summary judgment is due to be granted to the Board on McElrath's claims of race and gender discrimination relating to the positions that required a teaching certificate because she has not met her *prima facie* burden of proof as to these claims.

### b.   The Educational Positions—No Teaching Certificate Required

The court now turns to McElarth's claims of race discrimination[20] relating to the educational positions that did not require a teaching certificate.  It is undisputed that McElrath meets the first three elements of her *prima facie* case: (1) she is a member of a protected class; (2) she applied for, and was qualified to fill,[21] the positions; and (3) she did not receive the positions despite her qualifications.  The record is murky and in places contradictory on the fourth element—whether the

---

[20] All of the applicants hired for these positions were female so there can be no gender discrimination claim.

[21] Because these positions were aide or auxiliary positions, McElrath was qualified based on her employment history with the Board. Doc. 35-2 at 107; Doc. 35-3 at 4, 6; Doc. 35-8 at 9.

Board kept the position open or filled it with a white person.  The court discusses each position separately below.

### i.      *Parrish Elementary School, K-3 Summer Literacy Camp Aide*

Although McElrath and the Board contend that the position was never filled (*see* Doc. 35-2 at 101 & Doc. 35-3 at 4), the record contains a notification from the Board to McElrath that the position had been awarded to another applicant. Doc. 35-1 at 15.  Looking at this evidence in the light most favorable to McElrath, as the court must at this stage, the court will assume that she has established a *prima facie* case as to this position.  The court, therefore, continues the *McDonnell Douglas* analysis.

Noting that it offered McElrath a support position for the same summer at Valley Junior High (*see* Doc. 35-4 at 1; 35-8 at 10), the Board argues that it would have considered McElrath to be unavailable for this position. Doc. 35-3 at 4.  To establish that this reason for not hiring her is a pretext for race discrimination, McElrath argues that "there was miscommunication"[22] about her hiring for the support position at Valley Junior High and the Board "did not raise the issue of her unavailability at the time the job was open." Doc. 45 at 19.  This argument is unavailing.  Even if the court accepts McElrath's claim that the Board's stated reason

---

[22] McElrath points to the email stating that she had been awarded the position, but that someone would contact her before she should report to the job. *See* Doc. 45 at 18.  Without any record support, McElrath contends that no one contacted her. *See* Doc. 45 at 18.

was false, she has not created a question of fact as to whether the real reason for not

hiring her into this position was race discrimination.  Her only evidence is the simple

fact that the Board hired a white person instead of her.  But this argument does not

meet McElrath's burden. *See Mayfield v. Patterson Pump Co*., 101 F.3d 1371, 1376

(11th Cir. 1996) ("Conclusory allegations of discrimination, without more, are not

sufficient to raise an inference of pretext or intentional discrimination where [an

employer] has offered . . . evidence of legitimate, non-discriminatory reasons for its

actions.") (citations omitted).  Likewise, McElrath's own subjective belief that the

Board discriminated against her is not enough to carry her burden. *See Holifield v.

Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997), *abrogated on other grounds by Lewis*,

918 F.3d at 1221 (holding that the plaintiff's "opinion, without more, is not enough

to establish a *prima facie* case of race discrimination.").  For these reasons,

McElrath's claim of race discrimination as to this position fails as a matter of law.

## ii.        *Sumiton Elementary School, K-3 Summer Literacy Camp Aide*

McElrath alleges in her amended complaint that the Board hired Kassie

Salors, a white woman, as the summer literacy camp aide. Doc. 9 at 11.  The

evidence in the record is not so clear.[23]  McElrath did receive a notification from the

Board that it had awarded the position to another applicant, but it did not identify

---

[23] The court agrees with McElrath that the Board's reference to the hiring of Salors in November 2021 as a certified teacher (Doc. 35-3 at 4) does not address the position at issue here.

that person. Doc. 35-1 at 16.  Buried in the record, however, is a document titled "Public List of Walker County Board of Education Posted Support Summer Literacy Position(s)," dated May 13, 2021, that lists "Kassie Salors" and "Sherrie Hawkins" as Sumiton Elementary K-3 Summer Camp aides. Doc. 35-8 at 10.  Neither party references this list, and it does reflect the race of either aide.  Looking at all of the evidence in the light most favorable to McElrath, however, the court will assume that she has established a *prima facie* case of race discrimination and continue with the *McDonnell Douglas* analysis.

The Board's position again is that McElrath could not have been considered for this position because she had been hired in a different position for the same summer. *See* Doc. 35-4 at 1; 35-8 at 10.  To establish pretext, McElrath claims the Board "was systematically denying the Plaintiff available positions that she was qualified for." Doc. 45 at 20.  The problem with this argument is twofold.  First, it does not address the Board's contention that she was unavailable for this position because of the other summer position, thus failing to meet the Board's reason "head on and rebut it." *Chapman*, 229 F.3d at 1030.  Second, McElrath cites to no specific evidence to support her theory that the Board's decision not to hire her was because of her race, and her conclusory allegations of race discrimination and subjective beliefs that she was not awarded positions because of her race are insufficient as a matter of law. *See Mayfield*, 101 F.3d at 1376; *Holifield*, 115 F.3d at 1564.

### iii.     *Valley Junior High School, Auxiliary Teacher*

The evidence on the final paraprofessional position is clear.  McElrath applied for an auxiliary teacher position at Valley Junior High on September 22, 2021, but the Board hired two white women, Julie Vines and Tabetha Akins. Doc. 35-2 at 105–09.  The Board hired Vines on September 8, 2021, about two weeks before McElrath applied for the position. *See* Doc. 35-2 at 105; Doc. 35-5.  It should be apparent that the Board could not have discriminated against McElrath when it chose Vines before McElrath applied for the job.  The Board did not hire Akins until January 31, 2022. Doc. 35-5.  McElrath, therefore, has established a *prima facie* case of race discrimination as to the position awarded to Akins, and the burden shifts to the Board to provide a legitimate, nondiscriminatory reason for hiring Akins over McElrath.

The Board hired Akins based on the recommendation of the supervisor over the Pre-K programs. Doc. 35-3 at 6.  While this articulation of a legitimate nondiscriminatory reason may leave something to be desired, it meets the Board's "exceedingly light" burden of articulation. *See Turnes v. AmSouth Bank NA*, 36 F.3d 1057, 1061–62 (11th Cir. 1994) ("The employer need only offer admissible evidence sufficient to raise a genuine issue of fact as to whether it had a legitimate reason for not hiring the plaintiff.").  The burden thus shifts back to McElrath to produce sufficient evidence to permit a reasonable factfinder to find that the Board's reasons for not hiring her were pretextual. *See Burdine*, 450 U.S. at 253.  McElrath has not

presented such evidence.

McElrath's pretext argument centers on the decisionmaker—Tanya Guin. The record appears to show that Guin was the supervisor who recommended Akins for the position. *See* Doc 34 at 21–22; *see also* Doc. 35-2 at 106–07.  As best the court can tell, McElrath contends that Guin did not recommend McElrath because of her involvement in McElrath's previous lawsuit in 2014. *See* Doc. 45 at 23.  But even if Guin selected Akins in retaliation for a previous lawsuit, this would not establish that the Board made the selection based on McElrath's race, which is what Title VII and § 1981 make actionable.  McElrath therefore has failed to show pretext as to the position given to Akins.

### c.     The Non-Educational Positions[24]

Finally, the court turns to McElrath's claims of race[25] discrimination in the Board's decisions to fill the non-educational positions.  For these positions, the critical questions in the *prima facie* case are whether McElrath applied for and was qualified for the position.  The court discusses each position in turn below.

### i.     *Walker County Board of Education, Office Technical Support*

McElrath applied for this position on or around March 1, 2022. Doc. 35-2 at

---

[24] The Board awarded these positions after McElrath filed her EEOC charge.  The Board, however, does not challenge whether McElrath administratively exhausted these claims.  And even if they were not exhausted, § 1981 claims do not require exhaustion.

[25] As best the court can tell, the Board awarded all of these positions to women.  Accordingly, McElrath's claims can only be for race discrimination.

115–16; Doc. 35-3 at 7. The job posting specifies four primary qualifications for the position: "(1) degree in technical field or equivalent training and/or experience; (2) network administration experience required; (3) supervisory experience required; and (4) working in-depth knowledge and experience of active directory design and implementation[.]" Doc. 35-7 at 1. There is no evidence in the record that McElrath had the requisite qualifications for the position, so her *prima facie* case of race discrimination fails as a matter of law.

### ii.   *Walker County Board of Education, Network Technician Level 1*

McElrath applied for this position on or around May 4, 2022. Doc. 35-2 at 116. The job posting for this position outlines the responsibilities and the technical skills and knowledge required for the job. Doc. 35-6. McElrath has experience as a paraprofessional and a degree in elementary education and special education. She did not submit any evidence to show how her background, technical skills, experience, education, or credentials align with or even relate to the qualifications for a network technician. Because McElrath has not shown that she was qualified for the network technician position, she has not met her *prima facie* burden.

### iii.   *Cordova Elementary School, Bookkeeper*

McElrath did not apply for this position and contends the Board did not post it. Doc. 35-2 at 125, 139–41; Doc. 35-3 at 7–9. The Board claims that it posted the position as Position No. S-0773 from March 29, 2022, until April 5, 2022 (Doc. 35-

3 at 8), but did not submit a copy of the posting to the court.  The Board filled this position by transferring Shawna Gilbert.[26] Doc. 35-3 at 8; Doc. 35-2 at 125.

Ordinarily, a plaintiff's failure to apply for a position would end the discussion.  However, the Eleventh Circuit has emphasized that the elements of a *prima facie* case are not meant to be rigid or inflexible. *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).  To be sure, McElrath did not apply for the position, but there is a question of fact as to whether the Board posted the vacancy. In such a situation, other courts have concluded that it is enough for a plaintiff to show that she would have applied for a position had she known it was available. *Taylor v. Canteen Corp*., 69 F.3d 773, 781 (7th Cir. 1995); *see also Davis v. St. Dept. of Health*, 744 F. Supp. 756, 761 n.2 (S.D. Miss. 1990) (noting that although plaintiff did not apply for position in question, this is "of no moment in this particular case for defendants never sought or obtained applications from anyone").  Accordingly, the court continues to the question of whether McElrath has shown she was qualified for the bookkeeper position.

There is no evidence before the court about the qualifications for this position and whether McElrath had the required background, skills, and knowledge to be eligible for this position.  McElrath ignores this element of her *prima facie* case and instead states that she "reaffirms her argument and discussion that the Defendant's

---

[26] The court assumes Gilbert is a white woman. *See* Doc. 35-2 at 69–70; Doc. 35-3 at 8.

policy and practice is racially motivated, and plaintiff was never considered for this position." Doc. 45 at 26.  This argument misses the mark.  McElrath provides no evidence to support her theory that the Board's decision not to hire her was because of her race.  Her conclusory allegations of race discrimination and subjective beliefs that she was not awarded positions because of her race are insufficient as a matter of law. *See Mayfield*, 101 F.3d at 1376; *Holifield*, 115 F.3d at 1564.

### iv. *Parrish Elementary School, Bookkeeper*

McElrath did not apply for the position and contends it was not posted.[27] Doc. 35-2 at 125, 139–41; Doc. 35-3 at 7–9.  Sharon Riddle,[28] who was a receptionist at Parrish Elementary School, applied for the position and the principal selected her based on her interview performance and the results of a test given to all of the applicants. Doc. 35-3 at 8.  The Superintendent recommended Riddle and the Board approved her transfer. Doc. 35-3 at 8.

Like the other bookkeeper position, the court finds for summary judgment purposes that McElrath would have applied if the Board had posted it, and thus moves on to her qualifications.  But here again, McElrath introduced no evidence to show the qualifications for this position or that she met them.  And there is no evidence that McElrath took the performance test for this position or that she had

---

[27] The Board asserts that this position was posted as Position No. S-0883 from June 14, 2022, until June 20, 2022. Doc. 35-2 at 8.  But McElrath filed her amended complaint in May 2022, a month before the alleged posting, and specifically cited this position. Doc. 9 at 20.

[28] The court assumes Riddle is a white woman. *See* Doc. 35-2 at 69–70; Doc. 35-3 at 8.

any prior bookkeeping experience.  In other words, McElrath did not prove that she was qualified to hold this position.  And, as before, McElrath ignores this element of her *prima facie* case and points to her unsupported allegation of the Board's racially discriminatory hiring practices. Doc. 45 at 26.  This argument fails for the reasons stated above.  Her conclusory allegations of race discrimination and subjective beliefs that she was not awarded positions because of her race are insufficient as a matter of law. *See Mayfield*, 101 F.3d at 1376; *Holifield*, 115 F.3d at 1564.

### v.    *Central Office, Payroll Position*

McElrath did not apply for the position and contends it was not posted. Doc. 35-2 at 125, 139–41; Doc. 35-3 at 7–9.  The Board claims that it posted the job as Position No. S-0879 from May 3, 2022, until June 6, 2022. Doc. 35-3 at 8.  The Board hired Amy Vick[29] for this position because she had prior relevant experience as a bookkeeper at Parrish Elementary School. Doc. 35-3 at 8.

Like the two bookkeeper positions, the court assumes McElrath would have applied had she known about the vacancy.  But also like those vacancies, McElrath introduced no evidence to show the qualifications for the payroll position or that she was qualified to work in it.  And McElrath again ignores this element of her *prima facie* case and points to her unsupported allegation of the Board's racially

---

[29] The court assumes Vick is a white woman. *See* Doc. 35-2 at 69–70; Doc. 35-3 at 8.

discriminatory hiring practices. Doc. 45 at 26.  This argument fails again.

### vi. Central Office, Purchase Order Position

McElrath did not apply for this position and contends it was not posted. Doc. 35-2 at 125, 139–41; Doc. 35-3 at 7–9.[30]  The Board hired Rhonda Posey[31] for the position because she had previous relevant experience as a bookkeeper at Oakman Middle School. Doc. 35-3 at 9.

McElrath introduced no evidence of the qualifications for this position and did not prove that she was qualified for it.  She again relies on her unsupported allegation of the Board's racially discriminatory hiring practices. Doc. 45 at 26–27. This argument fails for the reasons stated above.

### vii. Valley Junior High School, Library Aide

McElrath did not apply for the position and contends it was not posted. Doc. 35-2 at 32–41.  But unlike the other jobs for which she did not apply, McElrath was aware of this vacancy.  In fact, in August 2021, McElrath contacted Joe Harrison, her principal, to inquire about the library aide position that would become available later that school year (Doc. 35-3 at 32, 110–11), and then she followed up with him in January 2022 when she learned that the previous library aide had retired. Doc. 35-2 at 110.

---

[30] The Board claims that it posted the job as Position No. S-0646 from June 3, 2020, until June 10, 2020. Doc. 35-3 at 9.  Again, however, McElrath's amended complaint, filed in May 2022, specifically references this position. Doc. 9 at 19.

[31] The court assumes Posey is a white woman. *See* Doc. 35-2 at 69–70; Doc. 35-3 at 8.

Despite these inquiries, McElrath did not apply for the position. Brandi Gunter, on the other hand, submitted a voluntary request form requesting this position. Doc. 35-4 at 12. There is no evidence that McElrath submitted a transfer form. The Board approved Gunter's voluntary transfer request and hired her for the library aide position on January 13, 2022. Doc. 35-4 at 11. Even if McElrath had applied, there is no evidence that she was qualified to serve as a library aide. Because she had knowledge of the vacancy but did not apply, and also because she did not establish her qualifications, McElrath has not met her *prima facie* burden to show race discrimination as to this position.

In the alternative, assuming McElrath established her *prima facie* case, the Board claims that it hired Gunter because she submitted a formal transfer request for the position and held her employment with the Board for eight years longer than McElrath. Doc. 34 at 24; Doc. 35-4 at 11–13; Doc. 35-3 at 7; Doc. 35-5. As evidence of pretext, McElrath posits that the Board's transfer policy is racially motivated because it enables the Board to award positions to other people when she is qualified to hold the positions. Doc. 45 at 25. This argument does not establish that the failure to transfer McElrath was a pretext for race discrimination for a number of reasons. McElrath offers no specific evidence to support her theory. And her conclusory allegations of race discrimination and subjective beliefs that she was not awarded positions because of her race are insufficient as a matter of law. *See Mayfield*, 101

F.3d at 1376; *Holifield*, 115 F.3d at 1564.  In other words, McElrath has not created a question of fact as to whether the Board's reasons for transferring Gunter to the library aide position are not credible or that race discrimination was the real reason for not hiring her in the position. *Alvarez*, 610 F. 3d at 1265.

### viii.    *Central Office, Insurance Position*

This position was not posted (Doc. 35-3 at 8) and McElrath did not apply for it. Doc. 35-3 at 8.  Instead, the Board reassigned the insurance duties to a payroll specialist who was already employed in its central office. Doc. 35-3 at 8.  There is no evidence of this person's race.  But even assuming that McElrath could establish a *prima face* case of race discrimination, her pretext argument here is the same as for many of the other positions—without any evidence in support, she claims that "Defendant's policy and practice is racially motivated, and plaintiff was never considered for this position." Doc. 45 at 26.  This argument fails for the reasons discussed above.

### 2.    *Convincing Mosaic*

Even if she cannot establish a *prima facie* case for discrimination under *McDonnell Douglas*, McElrath can "survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  A triable issue of fact exists if the record, viewed in a light most

favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker. *Id*.; *see generally Hamilton*, 680 F.3d at 1320.  McElrath can establish a convincing mosaic by pointing to evidence that demonstrates, for example, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred; (2) systematically better treatment of similarly situated employees; and (3) pretext. *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (internal citations and quotations omitted).

Other than a citation to *Jenkins* and a passing reference to this standard, McElrath does not advance any argument for a convincing mosaic of circumstantial evidence of race or gender discrimination. *See* Doc. 45 at 13.  In her attempt to survive present "circumstantial evidence that creates a triable issue concerning the [Board's] discriminatory intent," *Smith*, 644 F.3d at 1328, McElrath instead relies on the fact that all of the jobs in question were filled by white or male candidates. Doc. 9 at 15; Doc. 35-2 at 53, 69–70, 124–25.  In essence, her evidence of race and gender discrimination boils down to this testimony: "the people who have been awarded these jobs or transferred into these jobs have no more or maybe no less certification than I do.  But they have been hired [and] they're all white males or females . . . ." Doc. 35-2 at 69–70.  This is simply not enough to survive summary judgment.

There is no evidence of suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred. *See Jenkins*, 26 F.4th at 1250.  To the contrary, McElrath confirmed that no one at the Board made any race-based comments, comments about her gender, or any otherwise derogatory comments. Doc. 35-2 at 53–54, 69.  And the evidence belies her contentions about systematic disparate treatment of similarly situated employees.  Instead, the record generally shows that the people hired over her were certified teachers, had more experience, or otherwise more qualified to hold the positions.  The Board produced evidence about each position.  In contrast, McElrath offers only her personal opinions, not concrete evidence that race or gender were the real reason for not awarding her the positions.  This is not enough. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted) ("Speculation does not create a genuine issue of fact.").

Ultimately, it is not the court's job to decide whether an employment decision is fair or wise, only whether it is legal. *See Damon*, 196 F.3d at 1361.  To succeed, McElrath must show "circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Tynes v. Fla. Dep't of Juv. J.*, 88 F.4th 939, 946 (11th Cir. 2023).  She has not carried that burden, so the court must grant summary judgment to the Board on her claims of race and gender discrimination.

### C.     Retaliation

Title VII protects an employee from retaliation by her employer because she (a) opposed any practice prohibited by Title VII or (b) participated in any manner in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a); *EEOC v. Total Sys. Servs., Inc*., 221 F.3d 1171, 1174 (11th Cir. 2000).  While 42 U.S.C. § 1981 does not explicitly protect individuals from retaliation, courts have extended the statute to cover retaliatory conduct. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451–52 (2008); *Andrews v. Lakeshore Rehab. Hosp*., 140 F.3d 1405, 1412–13 (11th Cir. 1998).  The elements of claims for retaliation under § 1981 and Title VII are the same and need not be analyzed independently. *See Butler v. Ala. Dept. of Transp.*, 536 F.3d 1209, 1212–13 (11th Cir. 2008).

The *McDonnell Douglas* burden-shifting framework governs retaliation claims based on circumstantial evidence. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993).  To establish a *prima facie* case of retaliation, McElrath must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal relationship between the two events. *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1363 (11th Cir. 2007).  If she demonstrates a *prima facie* case of retaliation, the burden shifts to the Board to show a non-retaliatory reason for the adverse employment action. *See id*.  If it succeeds, McElrath must satisfy the "but for" test pronounced in *University of Texas*

*Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013). *See Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1294 (11th Cir. 2021) (citation omitted). "That is, the plaintiff must show that, based on the evidence, one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action." *Id*.

## 1.    *Statutorily Protected Activity*[32]

McElrath alleges that she first engaged in statutorily protected activity when she filed "a harassment and discrimination claim against Principal Joe Harrison" on October 25, 2021. Doc. 45 at 30; Doc. 35-1 at 34–35; Doc. 45-1 at 3. Her claim form lists 15 dates of alleged harassment and "abuse of authority" by Joe Harrison. Doc. 35-1 at 34. Although unclear from the form, the court assumes McElrath included the other dates as references to previous complaints about Harrison to Howell, Rowe, and Harrison himself.

Statutorily protected expression is not limited to formal complaints and may extend to those "who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. St. of Fla. Dept. of Law Enf.*, 868 F.2d 397, 400 (11th Cir. 1989). To constitute statutorily protected expression, a plaintiff's complaint must meet two requirements: (1) "it must put the employer

---

[32] McElrath also appears to rely on her 2014 lawsuit as support for her retaliation argument. Doc. 45 at 23. That lawsuit is far too remote in time to have any material bearing on the events alleged in this lawsuit.

on notice that the plaintiff is opposing a practice made unlawful by Title VII by explicitly or implicitly conveying a belief that the practice constitutes unlawful employment discrimination;" and (2) "the complaint must be based on a 'good faith reasonable belief' that the plaintiff's employer engaged in unlawful discrimination, but the plaintiff need not actually establish an underlying discrimination claim." *Posey v. O'Reilly Auto. Stores, Inc.*, 2014 WL 3809957, at *11 (N.D. Ala. July 31, 2014) (citing *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010)). In other words, to be statutorily protected, the activity must be related to an unlawful employment practice protected under the statutes. *See Satchel v. Sch. Bd. of Hillsborough County*, 251 F. App'x 626, 628 (11th Cir. 2007) ("The activities cited in Satchel's complaint, including filing a union grievance, filing an informal complaint of harassment by a co-worker, and writing letters to the editor of local newspapers, do not constitute the type of protected activity contemplated by Title VII because Satchel failed to allege that the complaints included in those documents had any relationship to race or otherwise indicate that the School Board was engaged in unlawful employment practices.").

Although she used terms like "harassment" and "discrimination," McElrath never reported that any of these incidents between her and Harrison (or anyone else) occurred because of her race or gender. For this reason, the October 25 complaint form (or any of the race- and gender-neutral complaints beforehand) could not have

put the Board on notice that McElrath was alleging discrimination on the basis of her race or gender. *See Neilson v. Talladega Coll.*, 2018 WL 1334973, at *11–12 (N.D. Ala. Mar. 15, 2018) (holding that "[a]s a matter of law, Plaintiff's race-neutral complaints about work-place annoyances" cannot put any employer on notice of a claim of race-based discrimination).

That being said, McElrath did engage in statutorily protected activity on October 27, 2021, when she filed her EEOC complaint alleging race and gender discrimination. Doc. 35-1 at 58.  For this reason, the court will consider whether McElrath has produced evidence of any adverse employment action connected to her EEOC complaint.

### 2.   *Adverse Action and Causal Connection*

A materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020).  As the Supreme Court recently explained, a plaintiff "need show only some injury respecting her employment terms or conditions." *Muldrow v. City of St. Louis, Mo.*, 144 S. Ct. 967, 977 (2024).

McElrath claims that six[33] adverse actions occurred after she filed her EEOC

---

[33] McElrath's brief lists eight alleged adverse employment actions. Doc. 45 at 31–32.  The court does not address the eighth alleged adverse action because it is repetitive of the fifth. *See* Doc. 45 at 31–32.  It also does not address the contention that the October 25, 2021, reprimand

charge: (1) the denial of access to professional development opportunities; (2) the denial of "several positions or promotions"; (3) her "remov[al] from her work area, called to the office by Principal Joe Harrison for no apparent reason"; (4) other employees' opening of her personal mail; (5) the denial of access to certain locations in the building by Harrison; and (6) Harrison's warning that "if she ate lunch with or took a break with the students . . . she would have to stay longer and make up that time." Doc. 45 at 31–32.  At the outset the court rejects three of the alleged adverse employment actions out of hand—removal from the work area, opening of her personal mail, and denial of access to areas of the school—because they do not amount to an "injury respecting her employment terms or conditions of her employment." *Muldrow*, 144 S. Ct. at 977; *see also Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (holding that "petty slights, minor annoyances, and simple lack of good manners" are not adverse employment actions).  The court addresses the remaining alleged adverse actions below.

### a.    Professional Development Opportunities

The fundamental reason why this alleged adverse action carries no weight is that McElrath did not introduce any evidence of missed professional development opportunities; she simply made the allegation in her brief (Doc. 45 at 31) without

---

was an adverse action since McElrath had not engaged in statutorily protected activity at the time. *See Debe v. St. Farm Mutual Auto. Ins. Co.*, 860 F. App'x. 637, 640 (11th Cir. 2021) ("[I]f the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected.").

any citation or other factual support.  Arguments in briefs are not evidence. *See Vega*, 432 F. App'x at 872.  Notwithstanding this deficiency, the court's independent review of the record reveals an email exchange between Harrison and McElrath from May 2021 about a development opportunity called "LETRS training." Doc. 35-1 at 31.  There, McElrath emailed Harrison asking to reuse the LETRS training materials from a recently retired employee. Doc. 35-1 at 31.  Harrison explained that the books are issued once per individual and cannot be reissued because they are sent directly from the state, but he provided her with a link to sign up for the waiting list for her own books. Doc. 35-1 at 31.

Even if the court were to consider this email to be evidence of an intentional denial of a professional development opportunity and conclude that this denial amounted to an adverse employment action, McElrath could not establish a causal connection with her protected activity.  Although McElrath claims that she was denied opportunities after her EEOC charge, this email exchange occurred in May 2021, five months before the charge.  Because the "alleged retaliatory conduct occurred before [McElrath] engaged in protected activity, the two events cannot be causally connected." *Debe*, 860 F. App'x at 640.

### b.    Denial of Positions or Promotions

Next, McElrath argues that she suffered an adverse employment action when she was "denied several positions . . . or promotion[s]." Doc. 45 at 31.  McElrath

does not name these positions or promotions and her citation to Defendant's Exhibit 4 at pages 57 to 59 misses the mark since Exhibit 4 contains only 13 pages. *See* Doc. 35-4.  The court can only assume McElrath intended to rely on her own EEOC charge (Doc. 35-1 at 57–59), but "an EEOC charge is simply a prerequisite to bringing a federal discrimination case, not evidence of any discrimination." *Baker v. Sikorsky Aircraft Corp.*, 2014 WL 840031, at *8 (M.D. Ala. Mar. 4, 2014).

It is not a district court's responsibility to weed through summary judgment submissions in search of evidence to support a party's position, *Byrne*, 635 F. Supp. 2d at 1297 n.16, but as best the court can tell, McElrath lost out on four positions after she filed her EEOC charge: (1) Cordova High School, Special Education Teacher on November 3, 2021; (2) Walker County Board of Education, Office Technical Support on March 1, 2022; (3) Sumiton Elementary School, K-4 on May 4, 2022; and (4) Walker County Board of Education, Network Technician Level 1 on May 4, 2022.  These decisions to hire an applicant other than McElrath amount to adverse employment actions. *See Walker*, 158 F.3d at 1187.

To prove a causal connection to any of these hiring decisions, McElrath must meet two elements.  First, she must demonstrate that "the decisionmaker actually knew about the employee's protected expression." *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1053 (11th Cir. 2020).  Second, she must prove that "the protected activity and the adverse action were not wholly unrelated." *Tolar*, 997 F.3d at 1294

(citation and quotation marks omitted).  A plaintiff may meet this standard by showing "close temporal proximity" between the statutorily protected activity and the adverse action; however, absent other evidence of causation, the temporal proximity "must be very close." *Id*. (citation and quotation marks omitted).  When close temporal proximity is lacking, a plaintiff can show causation "where intervening retaliatory acts commenced shortly after the plaintiff engaged in a protected activity." *Boyland v. Corrs. Corp. of Am.*, 390 F. App'x 973, 974–75 (11th Cir. 2010).

McElrath does not address the causation element in her brief other than to quote the law. *See* Doc. 45 at 29–32.  This is for good reason since there is no evidence that any of the actions in question are related to her protected activity. McElrath has not introduced evidence that the decisionmakers had knowledge of her EEOC charge.  In addition, the March and May 2022 hiring decisions are too remote in time to show a causal relationship with her protected activity. *See, e.g.*, *Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period between [the protected expression and the adverse action] does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."); *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001)

(finding a gap of four months is too long to constitute close temporal proximity).  As for the November 2021 position, McElrath did not receive notice of her rejection for the position until May 12, 2022. Doc. 35-1 at 21.  While the timing of her initial application was close to the filing of her EEOC charge, the actual decision on the position came almost seven months later.  This again is too much of a delay to establish causation as a matter of law. *See Thomas*, 506 F.3d at 1364; *Higdon*, 393 F.3d at 1221; *Wascura*, 257 F.3d at 1248.  For these reasons, McElrath has not met her *prima facie* case of retaliation as to the promotion decisions.

### c.    Making Up Time

McElrath's final claim that the Board retaliated against her in violation of Title VII arises from a discussion with Harrison. Doc. 45 at 32; Doc. 45-1 at 4.  Specifically, McElrath contends that Harrison told her "if [she] took lunch and/or break with the students, [she] would have to add time to [her] day and stay longer to make it up." Doc. 45-1 at 4.  This requirement arguably amounts to an adverse employment action to the extent it negatively affects the conditions of her employment. *See Muldrow*, 144 S. Ct. at 977.  But McElrath does not address causation in her brief and the court is aware of no evidence in the record reflecting when this conversation occurred.[34]  Without any evidence linking the conversation

---

[34] The court's review of the record found a March 30, 2022, email from Harrison to McElrath in which he wrote: "I noticed that you have recently been signing out at 2:45.  Please adhere to the schedule of 7:30-2:30 that was discussed at the beginning of the year meeting with aides." Doc.

to her protected activity, McElrath's retaliation claim fails as a matter of law.

## IV.  CONCLUSION

For these reasons, the Board's Motion for Summary Judgment (Doc. 33) is

due to be granted as to all pending claims.  A separate final order will be entered.

DONE and ORDERED on August 14, 2024.

_____

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

_____

35-1 at 50.  Even this note—if it is somehow the source of McElrath's complaint—is too remote
in time to establish causation.